My name is Jeff Metzger. I represent the appellant and plaintiff, Victor Rabinowitz. As was mentioned in the appellee's brief and was reminded to us by this court in a case two weeks ago called Eichacker v. Paul Revere, the purpose of the physician's care provision in a disability insurance policy is not for the purpose of dictating the care for an insured, but rather simply as a protection to the insurer that the insured is really disabled, not malingering, not committing fraud. It is in that context And that the treatment, I'm sorry, I don't want to interrupt your opening statement. And also part of it seems to be that the treatment be designed to get him back to work. Well, I want to address that because I think that provision, which is that particular provision, which is not found in the physician's care of the cases which have addressed this position in the past, that provision that is, says it's intended to return him to work, is, should be also held to be against public policy, is also ambiguous and also conflicts with the general statement of the physician's care provision, which is that care be appropriate under prevailing medical standards. It is our position that the matter should be reversed because everything, there's two provisions beyond that in this particular policy that should be declared as against public policy and unenforceable, and that the remaining portion of the provision, that is, the care be appropriate under prevailing medical standards, creates tribal issues of fact under the evidence in this record. Just as a matter of introduction, let me reintroduce the provision itself that we'll be discussing. The total disability requires that Part 1 be that the insured be unable to do the material and substantial duties of his occupation. That part is not at issue in this appeal. And it also says, and also he must be under the physician's care. And then the physician's care is defined as being that care which is appropriate for the condition disabling the insured, and I'm paraphrasing, under prevailing medical standards. And that's what we normally find in all the cases. Then it goes on, it skips a paragraph, then it goes on to the next paragraph and says also the care must be consistent with the nature of the disorder, which I would contend is essentially superfluous. It says the same thing that the first provision says, and also says is intended to return the insured to his occupation. Then jumping back one paragraph before, it says also that if the condition is one, the condition causing disability is a mental and or substance use disorder, then appropriate care must be approved by the insurer. Now, what does all this mean? First, the first phrase is prevailing medical standards. And you're as appropriate for the condition causing disability under prevailing medical standards. We would argue as a threshold point that this is a question of fact that requires evidence on the what are the prevailing medical standards, what is the appropriate care, especially as in this particular case, where there's actually two sides. There was the care rendered and then there was the insurance company's doctors who came in and said, no, we think that it should be another way. Well, that's well within the right of the insurance company to challenge the care. They have a right to make a challenge of it, but on our view it's a question of fact that should be tried, not decided on summary judgment. But back to the interpretation of the provision. Prevailing medical standards, according to who, as I've mentioned before, especially in this particular case where we're not just dealing with someone that just was abusing drugs. As the evidence is in the record, this was a person that had multiple conditions. The term of art that the doctors used is a dual diagnosis. He had, in addition to, he had clinical depression, he had a delusional disorder, and he also had drug abuse. Didn't he also have non-mental or substance abuse issues that were contributing to his disability or not? Well, there is a report in the record that also states that he had a disabling back and neck condition, which is another reason why we think this case should be tried and not decided at this level, because if it's a physical disability, and that report isn't challenged, the physical disability does not invoke this provision of the policy that says that they have the right to approved care, which, as I'll explain, I feel should be unenforceable on its face. But the fact is, is that even under their interpretation of the policy, that the evidence in the record, which was not challenged, it was that the summary judgment just dealt with, well, should he have a drug test, and why isn't it reasonable for him to have a drug test? Nobody addressed this question, which is now that there was a disabling neck condition, too, which, of course, they have the right to challenge, and which they can try. Don't the medical reports indicate that he, that this disabling physical condition led to the substance abuse, that he was self-medicating? I mean, it's, it's, there is a question to me about what really is the cause of the disabling condition here. Of course, I would agree, the, the, and causation is a question of fact, and that's not an uncommon situation in a, where, you know, what's, usually people have depression or have some mental and nervous disorder for a reason, and then, of course, if you start tracing back, you find some physical origin for that, and, of course, that wouldn't invoke this provision. And Your Honor raises another reason, among many, that the unraveling of this dispute should be by trial, and, and it's not as simplistic as saying, oh, my gosh, why doesn't he just undergo a drug test? It's so simple, you know, but that puts the cart before the horse, and I, and I think the starting point, of course, is, is how is this provision should be interpreted, and then what questions of fact exist among them? Well, you're, you seem to be asking us to declare this unlawful as a matter of California policy, that a public policy law that hasn't, haven't the California courts approved this particular provision? I am not asking the Court or suggesting to the Court that the provision that says that the care be appropriate and prevailing medical standards be declared unenforceable. That's fine. I think we have an issue as to how that is to be interpreted. For example, what does appropriate mean? Well, evictionary definition is appropriate means suitable or fitting. That's, that's what the policy says the insured must establish. It doesn't mean that there's not other ways. It doesn't even mean that there's not better ways. It doesn't say that they have to act. But I think Judge Wardle's question is, why do we have to declare any part of the policy invalid? Why? Most, most of what you're talking about is remanding so that the issues can be determined. But at the same time, you're suggesting that some part has to be stricken, even though we would remand for factual determinations and the rest. What part do you think has to be stricken? There are two parts that should be stricken. Number one is the provision that states that the insurance company has the right to approve the care. Why does that have to be stricken if that's construed as meaning that they have to approve anything that meets the conditions? Well, that would certainly be one way to interpret it, is to basically say that the only burden on the insurance, on the insured is to establish that there be appropriate care under prevailing medical standards, and that ends the inquiry. But the question is then if that, and that would be the question. Rather than striking something, if you were correct that it would be unlawful if it were interpreted the way the insurance company says, it wouldn't be unlawful the way you interpret it, would it? No. There would be a way that it can be interpreted to not be stricken by saying that the, but essentially that language would then be superfluous, because if the person is, establishes that they have appropriate care within prevailing medical standards, then there's nothing left for the insurance company to approve. See, the thing about the particular language, the intended to return you to your occupation, I guess that's in the insurance company's interest, because if you return to your occupation, then they don't have to pay disability. But doesn't it actually also mean get well, and that any treatment that is consistent with, or appropriate under prevailing medical standards would also be designed to get you well? Well, maybe, but maybe not. And I think there is some evidence in the record as to why that, this case may be, show a distinction. And that is where they say, well, we need to have this, these tests be able to show  They say the cause of this, of this impairment. Well, you know, Dr. Soldinger, who was dealing with a multiple condition, with a person that had depression, delusional disorders, was concerned about his divorce, was trying to get this person well. He was probably assuming that the person was using drugs. He had him on psychotherapy. He had him on medication. He had him in AA. He had him talking to his sponsor weekly. Determining, cause may be fine to say, well, should you return to work next year, next five years? But to the doctor who practices medicine, he's concerned with getting the person well. Besides the fact, what does intended to return to work mean? I mean, in a context of medicine. I was struggling with, how would you even, it's not defined. It basically gives the insurance company a blank check, just as the approval provision does too. It says approve, they have a right to approve care, but there's nothing in there that says under what standards. It essentially is unfettered discretion, a blank check to say, you know, that even if there's, even if the appropriate care under prevailing medical standards, if you look to the next section, this is why I really believe that the second paragraph should be stricken, because it says they have a right to approve treatment for substance use disorders. Well. That goes to another question. I mean, is drug testing a treatment, or is it something that's sort of a monitoring tool to see if you're complying, if the person is complying with the treatment? Well, I think the record is, and Dr. Soldinger would argue, that necessarily it wasn't actual care. It was a measurement device. It wasn't care. Given his diagnosis, you know, he had a number or a limited number of things that he felt was appropriate for this person. And even though he was asked the question, and you'll hear from the other side point out, that he said, oh, look, the guy could have, he could have drug testing, but I think the record also reflects and should be tried, a tribal issue, that why did Dr. Soldinger make those statements? He did say it's because it'll get the insurance company off your back, not necessarily because it was a required or recommended method of treatment by this particular doctor. And so it is the question of prevailing medical standards that, and care being appropriate, care being defined as suitable and fitting, and some guidance from this Court as explaining, you know, what this level of proof is, because these cases have come up, you know, that really don't, have not really set forth an interpretation of this provision. And if there's no more questions, I will reserve the rest of the time. Thank you, Your Honor. Mr. Metzger, on behalf of the appellant, Dr. Rabinowitz, has made some arguments here today that have never been made before. Frankly, this is the first time I've ever heard that there should be an argument that any of this should be against public policy. Yeah, I wondered about that. I didn't remember reading that in the briefs, but I... That's nowhere to be found. I figured I forgot it. No. It's the first time I heard it was sitting down right there. Let me just suggest that that's a ridiculous contention, not only because the case law supports a very, you know, this provision has never been part of any case that I am aware of. However, provisions very similar to this have been upheld consistently in none of the cases has ever said that this is against public policy. In fact, all of the cases, including some of the cases upon which both parties rely, and that would be part of the Henry case, not only support the provisions but say that there's a strong public policy behind this provision because it allows for an insured to make sure that he avails or she avails himself or herself of care that is appropriate for the condition. And it's not merely to prevent fraud. It is also to make sure that the insured is obtaining the proper treatment so that he can or she can get better. That is supported in the case law, certainly. But not only that, the clear intention of this provision... But do you, you know, the, if the care, the regimen that the doctor prescribes is medically appropriate and consistent with the standards in the community, would you say you have the right to disapprove it? Yes, because that's exactly what the language says we can do. No, it doesn't say that. Well, it says that it does say... Are you saying no matter how unreasonable your disapproval is? No, absolutely not. There are... If there, if it's, if the standard of care in the community is X, you can say that's not good enough for us. We want care that is, care that's only been given to the President of the country before. Recall that this provision has certain conditions or parameters. One of them is that the care needs to be not only consistent with the nature of the disorder, but also intended to return the insured to work. Now... That's not my question to you, though. Well... The question was if the care that's being given by the physician is consistent with the medical standards in the community, are you free to say, well, we don't like the medical standards in the community. We want something more than that, so we disapprove. Under this provision, the company has the ability to approve the plan if it leaves the plan, even if the plan hypothetically is consistent with prevailing medical standards. But the company, because recall that prevailing medical standards does not necessarily include treatment that returns an insured back to work. Of course, a disability insurance carrier has an interest in making sure that the insured seeks out that treatment, which will get, which will make him or her better, so that that insured can return to work. So even though in a certain circumstance, prevailing medical standards might be, might say that some care is appropriate, if it's not intended to return the insured back to work, the company can say, look, it violates this provision because, for example, here, Dr. Soldinger admits that if he was abusing drugs, then his care is inappropriate. So here in this particular case, Dr. Soldinger, his analysis, his evaluation, his opinion is that if my assumption is incorrect and he currently is using drugs... Yes. Let me direct you to the testimony. His testimony that we attached begins at Excerpt of Record, Volume 2, page 348. And... 338. 338. And it goes on for several pages here. In this testimony, what you'll find is that all of his assumptions are that Mr. Rabinowitz has stopped using drugs. Now, we put into evidence, which was not rebutted, by the way, that there is substantial indication here that he continues to use drugs. In fact, you won't find there's a declaration that he submitted to the court below, and nowhere will you find in that declaration he says, I've stopped using drugs. He refuses to be tested because, in fact, he told the doctor that the reason that he's – that he does not want to be tested is that the insurance company might find out that he is using drugs and his ex-wife may be able to use that information regarding his custody of his children. And what we find here is that Dr. Soldinger actually testified that if he was using drugs, then his care that he's been administering is inappropriate, that he needs to be taken to a hospital right away. I just don't remember seeing that testimony that if – because it seemed to me that the treatment that Soldinger was actually giving to – we might be off on a tangent here, but it seems to me that he was – he actually was giving him treatment, like AA, and having him report to his sponsor, et cetera, that was consistent with the belief that he was using drugs, it's just that he didn't want the testing because of the fact that you'd have then an official document as to that and it could affect the child custody issues. What you'll find is in the testimony that Dr. Soldinger believes that the last time he used drugs was at the time he went in for a renewal at Hazleton in Minnesota in 1998. He testified, and the record is clear, from some of the documents that he submitted, that he believes that he is sober and has been sober since 1998. And that is the assumption upon which he bases his opinion that his treatment is within prevailing medical standards. The reality is that he goes on to say, I've been trying to get him to be drug tested and he refuses for the reason I just indicated. But he says he's been trying to because the insistence by the insurance company that he have it is causing him stress, so he'd rather eliminate that as a source of stress. To me, we're arguing a factual question. I think the more important thing is the legal. I mean, if there are factual issues, as we're arguing, then we definitely need to send it back. But I guess the more important question to me is, is drug testing something that is necessarily under whatever standards, MA standards, required for the treatment of a dual diagnosis like this? And that's what I haven't seen in the record. The record is indicative of that. For example, under we submitted a declaration of Allan Blaustein. He indicates that that's at the supplemental excerpts of record, 131 through pages 134. We also submitted Dr. Blaustein's IME report dated 9-23-99. That excerpt of record is about page 276. Dr. Blaustein says that drug testing in a circumstance like this is within prevailing medical standards. And recall that both he and Dr. Holt, who is a neuropsychologist, both said we cannot determine a number of things without knowing whether or not he continues to use drugs. One, he claims to be disabled from cognitive impairment. However, they both say that we can't tell whether the cognitive impairment is from his current drug use or is it from something else. Is it from, you know, organic brain damage? Is it from something else? They say that they need the drug testing, one, to know whether or not he currently uses drugs so that if he is currently using drugs, as Dr. Blaustein and Dr. Holt say, that can explain all of his cognitive impairment. In fact, they say that Would that make him unable then to collect under his insurance policy? I mean, what difference would it make if he was using drugs? If he was using drugs, then everyone says he needs the right treatment, including his own doctor. That right treatment then is much more intensive than the treatment he is now receiving. And they say that they have to adjust the treatment based on whether or not he continues to use drugs because the treatment that Dr. Soldinger has administered assumes that he's not using drugs. So as Dr. Blaustein and Dr. Holt talk about, not only in their reports but in their declarations to the Court below, this is important to understand, one, the ideology of the condition, and, two, how to treat it. Well, it seems to me that if you read this policy and kind of look at the record, it's pretty clear this guy has continued to use drugs. He got in the accident and all that stuff. He doesn't want to be tested because he doesn't want the ex-wife to find out he's going to lose custody of his kid or whatever. So he probably is, and it seems to me that Soldinger must have understood that this fellow probably was using drugs to some extent. He didn't know maybe how much. But he thought that random testing would not be appropriate for the standard care. Your doctors disagree with that. Now, suppose he is continuing to use drugs. He's still incapacitated. He can't go back and work because of his drug dependency. I suppose that would then get you to the question of whether Soldering's plan of treatment was appropriate and whether it was intended to return him to his occupation. But it seems to me there's a question of fact as to whether it was appropriate. One doctor says yes. One doctor says no. Whether it was intended to return him to his occupation may depend upon how you construe that language, and there may be a dispute as to whether Soldering really thought that if he continued to do this and downplay the random drug testing that he could eventually bring this fellow around and maybe he could get him back to work. I don't know. But that seems to be a dispute. I don't think just the fact whether he's using or not using drugs would end the right or the entitlement to disability. We need to understand whether or not he is using drugs so that an appropriate treatment plan can be implemented. Dr. Soldinger also says that. He says everything's out the door if he continues to use drugs. And we all know, it's very evident, that he continues to use drugs. So what's happening is we have a physician who's testified. I don't believe he's --- It's so evident that everybody would know. Dr. Soldinger must know that, too, didn't he? Well, all I can tell you is that he testified that he didn't believe that he would continue to use drugs and, therefore, wasn't giving him the kind of treatment that he would need if he was. In fact, it's very clear that he said, if I found out that he was using drugs, he and I both have agreed he'd immediately go into Hazleton again and get the treatment he needs. Without this treatment, what happens is, and has been happening for years now, he's enabled by allowing to continue to abuse drugs, and there's no chance that he'll ever get better because he's not getting the right treatment. That's the key. We need to understand what the problem is in order to attack the problem. Right now, he's getting no care that deals with his drug problem. So he's been enabled for, since 1996, he has been able, and 1998, has been enabled by his doctor to take drugs and take the position that I don't want to have drug tests. So it's clear that the only way, and everyone, this is also very clear, that if he gets the right treatment, then it's very possible that, with the right treatment, psychiatric, dealing with the psychiatric issues and dealing with the drug problem, he can return to work. And this policy has what is known as a residual provision. So he can return to work, and if he's able to do one or more of the important duties of his occupation, and he has a loss of income, then he would be entitled to some benefits, but he might not be entitled to all of the benefits he would be entitled to if he were found to be totally disabled. What we know from the record is that during the time that he was abusing drugs, he did go back to work. He was taking depositions. He was doing things. And this is at a time when we know he was abusing drugs. Think about the potential if he's not using drugs. So right now, we have... There's a question about whether or not drug testing would make someone stop using drugs. It may not. But what we know is he's now using drugs. And so now Dr. Soldinger and others say to him, okay, you've told me that you're not using drugs. Maybe I suspected it. Maybe I didn't. But now you and I have agreed that once we found out definitively that you are using drugs, you now need to go in and get care. Everyone says if he is using drugs, he needs to have an intensive inpatient program. He's not getting that because he's gone to doctors who have allowed him to continue to abuse drugs. What happens under your policy if he's been in and out of these programs and none of them seem to have cured him? He collects benefits. And that's... And so the idea is that if he continues, if he subjects himself to drug testing and gets the care that he should be getting and it just doesn't work, you know, he's going to be entitled to benefits. Doesn't the record show that he was in and out? He was in and out. He was in and out for a period of time. He was paid during that time period. But what has happened is that that treatment was good for a while. And it, in fact, enabled him to go back to work for a period of time. See, you just said it. I mean, this is what I don't understand. So he goes in, he gets the treatment. I don't see how the drug testing cures anything. You're saying it's a predicate for getting treatment. But he got treatment. And he came out and he did drugs again. So maybe this is someone who the treatment isn't going to help and you just have to pay the benefits. We need to at least be in a position to let him get the right kind of care. You can't be in a position where he refuses to take drug tests and therefore not get the care and give himself and the company a chance to get the care he needs so he can return to work.  The appropriate care is dependent on whether or not he takes a drug test. Because under the policy it says we must approve a plan of treatment. And it has some criteria. It has to be consistent with the nature of the problem. And it has to be intended to return the insured to work. He violates that because he's not getting the treatment that he needs, and it's because his doctor assumes that he's not using drugs. So the drug test is important because it's a predicate to understanding whether he's getting, whether the problems that he has stem from drug use. And if that is the case, both Dr. Holt, Dr. Blaustein, our own hen house doctors say that that can be treated. And there are all kinds of ways to treat that that he's not getting right now. He's not getting group therapy. He's not getting in-house, inpatient intensive medical care. He's not getting the frequency of psychotherapy he needs to get over this problem. And so this is a predicate to the next step. And that's why it's so critical. In addition, when he goes to the independent medical exams, don't forget, he refuses again to be drug tested. So, you know, that's a can. That's a totally different issue. It is a different issue, but it's a very different issue. What says to the, has to submit to drug testing in the medical exam clause? Medical examination clause does not say you have to submit to drug testing. Every case that I'm aware of that has dealt with what an insured is obligated to do says, and we've cited some of those cases in our brief, you have an obligation to give effect to the purpose of the examination. You can't just show up. It would be akin to somebody with a bad back. And you're trying to go in to objectify. You want your insured to go in to objectify the back condition and to figure out what's wrong with the back so you can get the right treatment. And the insured shows up and says, I refuse to have an X-ray. I refuse to have an MRI. He can't do that, because then. Can he refuse to have a biopsy? It depends on the nature of the biopsy. If the biopsy was crucial to understanding what his problem was so it could be treated. In fact, the case law talks about that. There are some cases that say you can't refuse to have an X-ray. You can't refuse to have certain tests that are diagnostic, because in order to attack Invasive procedures? Yes, actually. There is a case that we cited. A California case? Well, first of all, I will say the Erica case is a California case. It's a California Supreme Court case that talks about it is a condition to benefit. The courts have given, since 1940s, have given effect to that clause that's cited in our brief. No one's arguing about going for a medical examination. The question is, what do you have to do when you go there? If they want to do an exploratory operation to determine something, can they do that? The clause doesn't on its face tell you that you have to submit to anything that they want to do in order for them to determine what they think your condition is. They say you go for an examination. That may mean just a normal, ordinary examination without any special procedures. It may or may not mean that you go and you can submit, they require you to submit to drug testing. If it's a minor invasive procedure, then it's only reasonable to say, for example, if it needed to draw some blood. It would be appropriate and actually condition that you, in order to give effect to what the insurance company is trying to do, and that is to understand what your problem is and verify it, yes, that would be appropriate to submit to an invasive blood test. That's, and we're not talking about that here. We're talking about essentially urinating into a cup. That's what we're talking about. And that opens up all of the doors then to the care that needs to be administered. Is that what they wanted, just the urine test or blood and urine? They wanted a urine test. Just a urine test. Just a urine test. Now, did they want that or just that medical examination, or did they want a series of urine tests over a period of time? They wanted at the IMEs that he submit to a urine test, and he denied that to three different examiners. Right. And then as part of an ongoing treatment program, as is enunciated. It's back into the treatment program, but not under the examination clause. Yeah. Oh, no, under the examination clause, no, no. All they wanted under the examination clause is that one urinate in a cup one time event. That's all. That's right. Well, but it says you can ask for those as often as you want. And if you got bad results in the first one, you might ask him to come back the next week or the next month. Once he agrees to do it once, he's agreed that that's part of an examination. Right? It's never been our position that he has to have ongoing, as part of the examination, the independent medical examination process. We wanted to know right then and there on three different occasions when he was, when he submitted to three different independent medical examiners, we wanted him to be evaluated at that point so that they could understand what his problem was, what the ideology of his complaints were, so that without knowing, you can't adequately address the problem, and that's the point. And so all we're talking about there is, you know, you've offered to do it. Do it. You know, put your mouth where your money is and money where your mouth is and let's, you know, urinate in a cup, because that's important. That's critical. Because if you're abusing drugs, and the whole treatment program that Dr. Soldinger has been involved with goes out the door by his own admission. And that's all we're trying to do here is make sure under this clause we have the right, it says we must approve the plan. And as the district court correctly held, that allows us certain discretion. And it's not unfettered. No, that's not unfettered discretion. We have to live within the realm not only of the covenant of good faith and fair dealing, but also of that particular condition. And so ‑‑ And maybe we can look at that. By the way, just look at page 356. Dr. Soldinger says, this is beginning page 87 of the deposition lines 4 through 9. When asked why doesn't he have drug testing, he says, I really don't know, because I argue with him constantly about it. I don't think that he has a reasonable rationale. But that's not the question. Okay. I know. I just wanted to point that out. I have that portion of the testimony. I'm looking. I'm trying to find the part. I also do, but I don't have the part that you mentioned before. And I think it's important if Dr. Soldinger says, I think he gave us a page citation before for that. Page 359 of his deposition. That wasn't what he gave us before. You mean the ‑‑ Where we can find the testimony that Dr. Soldinger says, if he were taking drugs, I would use my whole course of treatment, because out the window I'd do something different. He says, and I'm paraphrasing, but if you take a look at the record, page 359, excerpts of record 359. Okay. Read it to us. He's being asked about what would happen if ‑‑ What's the question? What's the answer? What do you ‑‑ he says, question, what have you done in terms of specific treatment modalities, he says, to aggressively confront him about going to meetings and asking him constantly about the area of the topic, which means drug testing, as well as making it clear to him that his promise and contract to me is, if he uses again, he will go to Hazleton. And he agrees that. Should he have a relapse, he will naturally go back to the hospital. Now, that's important. That's key, because he says, if I find out through drug testing that he actually is using drugs, what I've been assuming all along is out the door, he now needs to get immediate treatment at an inpatient facility. He's had a relapse. He's not saying that he needs to have drug testing to figure out whether he's had a relapse. Well, the relapse being the relapse on drugs. Right. But, I mean, you know, drug testing, you go in, he could be clean on that day or surrounding days and still go off and have, you know, whatever. That's the point of the ongoing random drug testing requirement, because that is right. You want to make sure that the insured is, you want to make sure that he, to monitor the status of his drug use. But you don't, I mean, you want to make sure, as the insurance company, that Dr. Solzner can tell, because he's seeing this patient on a regular basis. He can't tell. He's testified he can't, he believes he's not using drugs. That's his testimony. He says, if I knew he was using drugs, I would immediately send him to the hospital. He's saying that testimony says that? That's exactly what it says. He's having a relapse. I mean, an occasional use of drugs is not the same as a relapse. Well, I think he. It's your interpretation of that testimony. That's right. I mean, it clearly says relapse. You know, he said he's been sober since 1998. So he, a relapse, I must assume. Could you give us a page for that, too? 359 of the. He says he's been sober since 19, whatever it is. 359. Okay. So is it your position, really, that based on your interpretation of Dr. Solzner's testimony, that Mr. Rabinowitz should have been in Hazeltine all this time? No. Or any time? If he. Because you didn't require that. If he is abusing drugs, then part of the plan is, by everyone involved, that he needs to have more frequent therapy. It needs to be directed to drug abuse, with appropriate drugs for drug abuse. And there needs to be some inpatient and outpatient hospitalization. And it depends on what we find in terms of the drug use and how frequent it is. And so that becomes part of the plan, is, you know, if he's using it every day, that's a more intensive situation. If he's using it occasionally, then that might be a less intensive situation. But you have to adapt it based on what you know. What we know is he's not telling his doctor that he's using drugs. His doctor believes that. And he says, if I find that there's a relapse, I need to give him intensive treatment. And so the point is that at that point, when you know how often he's using drugs, then you can formulate, as the NIDA and APA guidelines that we've submitted indicate, that's a critical part of the evaluation of this condition. And it needs to be ongoing so we can determine what is the frequency of usage, so that he can be appropriately treated. So that is critical here. And that has been denied to the company by his refusal to submit to drug testing, because he is not getting the care he needs if he's a drug abuser. Mr. McKinnon, we keep going back to whether or not Sildring's opinion is appropriate care, or his treatment plan is appropriate care. And somewhere in there he said it would not be appropriate care, it would be contraindicated for this man to submit to random drug testing. Somewhere along the line he said that. Now, I'm not sure if that means it would be contrary to his care for him to be required to take a blood test against his wishes. If that was the medical opinion of the care that Sildring was rendering, then it would seem to me, you have doctors to say that, well that's ridiculous, that's not appropriate care, and a trier of fact would have to resolve that one. Suppose the opinion of the treating physician was, this man should not be required to do deep V-bands because of whatever reason. Then the IME comes along and during the examination they say, do a deep V-band. He says, I'm not going to do it. Now, that would be the examiner requiring something that the treating physician said was contraindicated by the treatment plan. And it seems to me the insurance company could not insist upon that unless it was determined that the treatment plan was inappropriate, which gets it right back to the question of, is there a triable issue of fact as to whether Sildring's plan was appropriate? I think the analysis should be based on the reading of this provision, because it does provide that we must approve a plan, and it talks about what that plan includes. As long as that plan is consistent with prevailing medical standards and is consistent with the care and intended to return the insured to work, that's the right we have under the policy, and that is the analysis. And there's no issue of fact that the plan that we have proffered is not intended to return him back to work and not consistent with the condition causing the disability. But isn't it your burden of proof to show that the plan that Sildring has is inconsistent and not intended, rather than the other way around? No. Why not? That struck me as odd that the district court put the burden of proof on the insured here. The insured always has the burden of proof with respect to insuring provisions. Right. So he proffers the plan that's consistent and appropriate or whatever. In his doctor's view, isn't it your burden then to say, no, it's not? No, because our burden is to provide a plan that is consistent with the policy language, and the plan would be that is consistent with the nature of the disorder and intended to return it. But that's not the way the policy reads, that the way he will get treatment is to go to the insurance company and ask them what they consider the proper treatment to be, and then find a doctor who wants to treat him in that manner. What he's supposed to do is get a doctor who determines what appropriate treatment is, and then they have to tell you, and you have to determine whether that complies with the appropriate treatment. The policy talks about, you know, physician's care is part of the total disability definition. The insured has the burden of proof. Necessarily, it also has the burden of proof. He has the burden of proof with respect to the physician's care clause. That clause talks about the, it says, if the condition causing the disability is a mental disorder, the appropriate care must be approved by us. We may require a plan of care from your physician. Such care must be, and it's talking about the plan that we, you know, obviously if we have the right under the policy to approve a plan, we also have then, therefore, the right to disapprove of a plan that doesn't fit with that criteria. And it's clear that, again, Dr. Soldinger's treatment was not geared to have him return to work. He was not doing anything to deal with drug abuse, and it looks like we all agree he's continuing to take drugs. And this just enables him to continue to use drugs and continue to fund that drug habit through disability benefits. So the burden on us is to come up with a plan consistent with this provision, which we have done. We have the right, it says we must approve this plan. Okay. That plan is, it has the conditions, and that's the analysis. And the district court said that that was the right analysis. And, of course, reading this like the plain language says, that that's all we need to show. So. Okay. I think we better, we're way over time, so we better bring this one to a halt also. Thank you. Thank you. The last bit of discussion establishes the point that the interpretation interferes inappropriately with the physician-patient. Let me start with this question. Your opposing counsel says that Dr. Solinger acknowledged that the course of treatment was not correct if your client was still taking drugs. And that if he were taking drugs, the appropriate course of treatment would be something different to have him go into an institution again. What's your response to that? A, that the, well, it's triable, because that's, it's still the, his entire plan has to be considered as to whether or not it's under prevailing medical standards. And reference to Dr. Blaustein and Dr. Holt, who are hired by the insurance company, do not establish that. I'm just asking about Dr. Solinger. Did Dr. Solinger say in his testimony that this is not the course of treatment he would give if your client were taking drugs? No. The portion that was discussed, as Judge Wardlow pointed out, was that it deals with a relapse. And there is no evidence here of a relapse. In fact, the references that are in the record that they made, too, that he shows up with blurry eyes and things of that sort, well, you know, we've discussed today, I mean, you may believe or that may suggest that that particular day he was using drugs, but that's just, that's not, that's not an issue. I mean, that's, that is, so there's no evidence that what exactly, that there, as a matter of law, the evidence in the record suggests that Dr. Solinger's care was not appropriate, that is, not suitable or not fitting under reasonable medical standards. Are you saying that the issue is whether he was taking drugs, that if he was taking drugs, that the course of treatment was not appropriate, but that it's a disputable issue whether he was taking drugs? That would be one of the triable issues that would then lead to the ultimate conclusion as to whether or not this was an appropriate plan for the condition causing disability, which is not as simple as simply was he taking drugs. Remember, this was a person that also had these other diagnoses. And before I forget, a reminder that there's also evidence in the record of a physical disability, which is a triable issue which should require the case going back on whether that is a disabling condition, because if that was a disabling condition, then all of this doesn't matter anyway, because he's entitled to benefits without their ability to approve it. But setting that aside, the question is, the question is, this is an individual that was, that had multiple conditions, multiple diagnoses, and this was a doctor who was trying to provide him with the best care that he could under the circumstances. Now, it isn't so simple. Remember, this issue about whether this custody issue is important here, because you have a person with a delusional disorder. And as Judge Wardle pointed out, I mean, the fact is is how all of this will impact his life is critical to the treatment. It's not so simple as saying, well, look, we'll give him a drug test, and if we find out he's taking drugs, we will then be able to say we know what treatment to give him. That's not the record. That's the question. Is that what Dr. Soldinger said? Did he say that if he knew he was taking drugs, this is not the course of treatment he would give him, rather he would have him go to an institution? The testimony that was addressed says that Dr. Soldinger said that he discussed with him whether that he wanted his commitment. Remember, what they're dealing with is in commitments with their patients, too. That's an important aspect of this relationship. He didn't say that he actually would do that. He wanted a commitment. Now, was that because he was trying to get the man to straighten out the man, or was it really something he would have actually done? That's only taking one portion of his testimony out of context there to say this is what I discussed with him. That doesn't make his entire plan of treatment not under prevailing medical standards. It was a complicated medical picture that this man was dealing with, and to say that simply if – well, it also gets into this whole point about, well, there's other issues about his ability to afford inpatient. Because we had this discussion, you asked the question, what if the care rendered is only that the President of the United States would have? Well, that brings into – do they have the right to insist upon that? And the answer that I heard him say was essentially yes. Well, what about if he can't afford it? What about if his HMO won't be able to approve it? What about if the doctor says it's contraindicated? What kind of position are we putting insureds in here if they're saying that they have the right, and he said it, you asked him two or three times, to be able to say we have the right to set the plan? And that's where I think this case starts. And that's why they don't have the right to set the plan. They have the right only to simply say and challenge whether the treatment is within prevailing medical standards as appropriate care, and if they – and they have the right to challenge that. And they have a right if they believe, because that's what all the cases have. That section is okay. And I've not ever once suggested that that first paragraph shouldn't be upheld. It should be explained. But if that – if they think it doesn't – appropriate within prevailing medical standards, they can say that, and then they have a right to condition benefits on that. And then the issue becomes it's to be tried on simply the issue of whether or not the care was appropriate under prevailing medical standards. But to give them – to make the next leap to say they have the right to approve with no standards, they just can – they can say – he says, well, we have the right to be safe, and we have the duty of good faith and fair dealing. The policy doesn't give them anything. What does the person – the insurer says if I meet prevailing medical standards for care that's appropriate, they can come in and say, because he said it, well, no, we have the right still to approve it. And if we don't think it's appropriate, then we have the right to approve it. That puts – it interferes with the position-patient relationship. It is unclear as to what the insurer should be entitled to in terms of benefits, and it also conflicts with the jurisprudence of this State that says if a person is unable to do the substantial and material duties of their occupation, is receiving care from a physician, they are entitled to benefits, period. And to take the giant leap because of this provision that's in there to protect against fraud and to now say that we have the right to insist that the care be intended to return the person to work or that we have the right to approve plans that may or may not be within prevailing medical standards, to me – and it really – when I said public policy earlier, what I really meant was that this is an interference, which we have argued throughout this appeal. It is an interference with the physician-patient relationship. What's wrong with the idea of a policy that says, you know, we're going to pay you as long as you're unable to work, but you've got to go get medical treatment, which is designed to help you get back to work? What's wrong with that as a matter of policy? Well, the policy says intended.  So the course of treatment is intended. Now, of course, if a doctor said any course of treatment intended to get you back to work would be bad for you, then, of course, he wouldn't have to do it. Or if the doctor said, there's no way this guy's going to go back to work, so there is no such course of treatment, that would also be fine. But assuming somebody could have a course of treatment that would be intended to help them get back to work, what's wrong with an insurance company saying you should have that course of treatment? Because it interferes with the physician's ability to care for his patients, who sees them on a regular basis, who is supposed to be concerned for the entire picture. And, like, in this particular case... Well, then the physician would say it's not consistent with the proper medical treatment to give him treatments that would get him back to work. That wouldn't be the best way to treat him. That would be all right. But the – I would argue that the evidence in this record suggests this person is not going to go back to work, regardless of whether he's on or off drugs because of cognitive impairments. But that's certainly – the record is certainly, at worst, unclear enough to say it's a tribal issue, because that permeates this record. And the assumption being made by the insurance company is get him off drugs, he necessarily becomes able to work again. And that's not... So is it one of your arguments that there is no course of treatment that could get him back to work, therefore – and that's a tribal issue of fact? Well, yes. But one of the things that I have to try to separate in my mind is, remember, the record here stops in terms of about 1999. I also know in my brain, because this has gone on for four or five more years, so I'm trying to answer your question as a basis of a record, when actually the accurate answer to that would be able to – would have to bring in a number of things that have occurred since that time, such as other evaluations that he's had. So it's – that's really a difficult question to answer. But – and he actually asked two. So the question is whether that's a tribal issue. Yes, it is a tribal issue. Okay. Well, I guess we have a lot of reading to do on the record, too. Two minutes. Okay. I think we've passed your time also. Thank you very much. Thank you. Yes? We can't have any more arguments now. You have a citation you want to give us. Give it to the clerk. It's a page number that you'd like us to look at. Thank you. Okay. Thank you, counsel. The case gets argued. We'll be submitted. The court will take a brief recess.
judges: Reinhardt, Thompson, Wardlaw